1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

CRUSADER INSURANCE
COMPANY, as subrogee of its insured,
San Vaccaro dba Coin Laundry,

               Plaintiff,

        v.

CINGULAR WIRELESS, LLC,
ERICSSON INC., SONY ERICSSON
MOBILE COMMUNICATIONS (USA)
INC., and DOES 1 through 50,

              Defendants.

NEW CINGULAR WIRELESS PCS,
LLC,

            Third-Party Plaintiff,

        v.

MAGNOLIA PLAZA, 627,

           Third-Party Defendant.

Case No. CV 09-2141 GAF (PLAx)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

        The trial of the third-party complaint and related counterclaim came on for hearing on December 14 and December 15, 2010.  Having heard the evidence and the closing arguments of the parties, the Court issues the following findings of fact and conclusions of law in this case.  For reasons discussed in more detail below, the Court concludes that neither party has met its burden of proving its affirmative case and

neither will recover anything in this lawsuit.  A judgment to that effect is set forth in a separate document.

# I.

## INTRODUCTION

On November 26, 2006, a two-alarm fire broke out on the roof of the Magnolia Plaza 627 strip mall ("Magnolia Plaza") in Long Beach, California.  The fire originated inside one of two large wooden cupolas on the mall's roof, where Cingular Wireless, LLC ("Cingular") had installed a cellular communications site.  The laundromat below the cupola ("Coin Laundry") sustained significant fire damage for which it was insured under a policy issued by plaintiff Crusader Insurance Company ("Crusader").  Crusader paid Coin Laundry's claim and later filed the present suit against Cingular.  Cingular's successor, New Cingular Wireless PCS, LLC ("New Cingular"), settled with Crusader and filed a third-party claim against Magnolia Plaza seeking to recover sums paid in settlement.  Magnolia counterclaimed against New Cingular for the damages it incurred in the form of lost rent and the costs of a security guard employed at the strip mall while the repairs were being made to the fire-damaged portions of the structure.

# II.

## THE CLAIMS

### A.  NEW CINGULAR

New Cingular presents three affirmative claims for relief: a breach of contract claim based on the alleged breach of the lease agreement; a claim for negligence based on an ordinary negligence theory and on a theory of res ipsa loquitur; and a claim for indemnification under the contract for losses attributable to acts or omissions of Magnolia Plaza.

Breach of Lease:  New Cingular bases its breach of lease claim on allegations that Magnolia Plaza violated the lease's requirements that it maintain the premises in "good and tenantable condition" and that it ensure that New Cingular had "sole, actual, quiet and peaceful use, enjoyment and possession" of the portion of the roof that New

Cingular leased from Mangolia Plaza.  Essentially, New Cingular argues that the ground-level utility room door, which allows access to a ladder that leads to the roof of the structure, allowed unauthorized persons to access the roof and make use of, or intrude into, the burned structure.  New Cingular theorizes that these unauthorized third persons caused the fire that disrupted its quiet and peaceful use of its leased premises.

<u>Negligence</u>: The negligence claim is based on substantially the same facts. New Cingular contends that Magnolia Plaza was aware that unauthorized persons were accessing the roof and that its failure to install a deadbolt on the utility room door and to otherwise maintain it in good working order allowed such persons to access the roof and cause the fire.  New Cingular also claims that it is entitled to recover damages under a res ipsa loquitur theory.  It argues that a fire does not ordinarily occur in the absence of someone's negligence, that Magnolia Plaza had exclusive control over the roof, and that it therefore should be held responsible for the fire that broke out in New Cingular's leased premises.

<u>Indemnification</u>: This claim is brought under Paragraph 9(b) of the lease agreement, under which Magnolia Plaza agrees to indemnify New Cingular for any injury "arising directly from the actions or failure to act of Landlord or its employees or agents, or Landlord's breach of any provision of this Agreement, except to the extent attributable to the negligent or intentional act or omission of Tenant, its employees, agents or independent contractors."  (Ex. 33.)  Based on the same facts that support its breach of contract and negligence claims, New Cingular claims that Magnolia Plaza should indemnify it for its losses: its $40,000 settlement with Crusader, over $82,000 spent to replace damaged equipment, and over $207,000 in attorneys' fees and other litigation costs.

**B. MAGNOLIA PLAZA**

Magnolia Plaza counterclaims for indemnification under Paragraph 9(a) of the lease agreement.  Paragraph 9(a) obligates the tenant to indemnify the landlord for any injury or loss "arising directly from the installation [or] use . . . of the Communication

1   Facility or Tenant's breach of any provision of this Agreement, except to the extent

2   attributable to the negligent or intentional act or omission of Landlord, its employees,

3   agents or independent contractors." (Ex. 33.) Magnolia Plaza seeks recovery of

4   $15,210 incurred for building security, $126,104 in lost rent from Coin Laundry, and an

5   unspecified amount of attorneys' fees and costs associated with the present litigation.

### III.

### FACTS[1]

In the late morning of November 26, 2006, a fire broke out in a cupola mounted

on the southeast corner of the roof of the Magnolia Plaza strip mall in Long Beach.

(Ex. 119 at 1, 6.) The cupola, which housed cellular communications equipment owned

and operated by New Cingular, was enclosed and accessible only through a secured

door on the west side of the cupola. (Ex. 119 at 22, 40.) The Long Beach Fire

Department (LBFD) received an alarm at 11:39 a.m., and the first units arrived at 11:42

a.m. (Id. at 1.) LBFD personnel initially accessed the roof via ladders and made

forcible entry into the cupola by prying open the door leading into the interior of the

cupola. After the fire flashed through the entryway as it received more oxygen,

firefighters quickly doused the fire with water, putting it out in a period of no more than

a few minutes. The business below the cupola, Coin Laundry, suffered water damage

as a result of the firefighters' efforts.

After the fire was extinguished, the interior and exterior of the cupola and the

other areas of the roof were photographed. The interior of the cupola was photographed

from the doorway because the floor was so substantially damaged that it was not safe to

enter. (Ex. 119 [LBFD Report and Photographs]; Exs. 46–56 [Awerkamp

Photographs].) The photographs, along with the testimony of percipient witnesses,

demonstrate that the lower portion of the cupola suffered substantial fire damage.

Much of the floor was burned away, and the remainder was deeply charred; the walls

---

[1] This section presents an overview of the events that occurred on November 26, 2006. Additional findings of fact are set forth in Section IV below.

and ceiling also exhibited substantial charring from the intense heat of the flames; and the cellular equipment in the upper portion of the cupola ceased operating. (Exs. 45–48; Ex. 119 at 24–36.) LBFD personnel estimated that, at its peak, the fire temperature exceeded 1,000 degrees Fahrenheit. LBFD personnel, and other experts who later observed the scene, concluded that the fire ignited inside the cupola at the floor level, but the fire's source was never determined.

After the fire, Coin Laundry filed a claim with its insurance company, Crusader Insurance, for the damage resulting from the fire. Crusader paid Coin Laundry's claim and became "subrogated" to Coin Laundry's rights in seeking to collect damages from any parties responsible for the fire. Crusader filed suit against New Cingular seeking to recover the proceeds paid to Coin Laundry. New Cingular filed a third-party complaint against Magnolia Plaza seeking to recover any sums paid to Crusader, and Magnolia Plaza counterclaimed against New Cingular seeking indemnification for rent lost while Coin Laundry was undergoing repairs and for the cost of hiring a security guard during the construction period.

## IV.
## DISCUSSION

### A. JURISDICTION

The Court has jurisdiction over the present action under 28 U.S.C. §§ 1332 and 1441(b).

### B. CLAIMS, ELEMENTS, AND BURDENS OF PROOF

A claim for breach of contract requires proof that the parties formed a contract, that the plaintiff performed its contractual obligations, that the defendant breached the contract, and that the breach caused damage. CACI Instruction No. 303; BAJI Instruction No. 10.85; accord Durell v. Sharp Healthcare, 108 Cal. Rptr. 3d 682, 697 (Ct. App. 2010). Here, there is no issue regarding contract formation. Rather, the question in connection with the breach of contract claim is whether Magnolia Plaza

1  engaged in any acts that breached its obligations under the lease, and whether that

2  breach caused the fire and the resulting damages.

3      A negligence claim requires proof that the defendant owed the plaintiff a duty

4  of care, that the defendant breached that duty, and that the breach proximately caused

5  the plaintiff's injuries.  John B. v. Superior Court., 137 P.3d 153, 159 (Cal. 2006); see

6  also CACI Instruction No. 400.  A negligence claim requires proof that the defendant

7  failed to use ordinary care to prevent injury to another as a result of the defendant's

8  conduct.  See John B., 137 P.3d at 160.  Ordinary care is "the degree of care in a given

9  situation that a reasonable person under similar circumstances would employ to protect

10  others from harm."  City of Santa Barbara v. Superior Court, 161 P.3d 1095, 1099 (Cal.

11  2007); accord CACI Instruction No. 401.  Thus, this case requires consideration of how

12  a reasonable landlord would have acted in the circumstances confronting Magnolia

13  Plaza prior to the fire that damaged New Cingular's premises and equipment.

14      New Cingular also invokes the doctrine of res ipsa loquitur to supports its

15  negligence claim.  Under that doctrine, New Cingular can raise a presumption that

16  Magnolia Plaza's negligence caused its injury if it can prove (1) that the fire is a kind of

17  event "which ordinarily does not occur in the absence of someone's negligence," (2)

18  that the fire was "caused by an agency or instrumentality within the exclusive control"

19  of Magnolia Plaza, and (3) that the fire was not "due to any voluntary action or

20  contribution on the part of" New Cingular.  Howe v. Seven Forty Two Co., Inc., 117

21  Cal. Rptr. 3d 126, 130 (Ct. App. 2010) (quoting Ybarra v. Spangard, 154 P.2d 687 (Cal.

22  1944)); see also Cal. Evid. Code § 646; CACI Instruction No. 417.

23      A claim for indemnification requires a showing of fault on the part of the

24  indemnitor and resulting damages to the indemnitee for which the indemnitor is

25  contractually responsible.  Great W. Drywall, Inc. v. Interstate Fire & Cas. Co., 74 Cal.

26  Rptr. 3d 657, 663 (Ct. App. 2008).  Express indemnity provisions like those in the lease

27  between New Cingular and Magnolia Plaza are "enforced in accordance with the terms

28  of the contracting parties' agreement."  Prince v. Pac. Gas & Elec. Co., 202 P.3d 1115,

1   1120 (Cal. 2009).  Under the terms of the lease, the Court therefore must determine

2   whether Magnolia Plaza's injuries "ar[o]se[] directly from the installation [or] use . . .

3   of the Communication Facility or Tenant's breach of any provision of [the lease" or

4   whether New Cingular's injuries "ar[o]se[] directly from the actions or failure to act of

5   Landlord or its employees or agents, or Landlord's breach of any provision of [the

6   lease]." (<u>See</u> Ex. 33.)

7          In this lawsuit, each party presents affirmative claims for relief.  Each therefore

8   bears the burden of proving those claims by a preponderance of the evidence.  The

9   standard under state law is set forth in CACI Instruction No. 200, which provides in

10  pertinent part:

11          A party must persuade you, by the evidence presented in court, that what
            he or she is required to prove is more likely to be true than not true. . . .
12          After weighing all of the evidence, if you cannot decide that something is
            more likely to be true than not true, you must conclude that the party did
13          not prove it. . . .

14  CACI Instruction No. 200.  <u>See also</u> Cal. Evid. Code §§ 115, 500.  Neither party has

15  met its burden.

16  **C. NEW CINGULAR'S CLAIMS**

17         Although New Cingular sets forth three theories of relief, all are based on the

18  same factual argument.  New Cingular contends that Magnolia Plaza sits in the midst of

19  a high crime area and that there is gang activity in the vicinity, as evidenced by graffiti

20  found on the exterior of the building.  In these circumstances, according to New

21  Cingular, Magnolia Plaza knew or should have known that a utility room door that

22  allows access to a ladder that in turn provides access to the roof was not adequately

23  maintained and secured.  Because of deficiencies in security, New Cingular asserts that

24  unknown persons broke into the utility room some time between 8:00 a.m. and the

25  ignition of the fire, gained access to the roof that morning, entered the cupola, and did

26  something to start the fire.

27         In support of its position, New Cingular offered the testimony of Frank Gimbel,

28  who visited the scene the day after the fire and noted that the door knob to the utility

room had been broken off, allowing unfettered access to the storage space and the ladder to the roof.  New Cingular also presented the testimony of John Awerkamp, an employee of a New Cingular contractor, who on the day after the fire observed the interior of the cupola, where he claims to have seen a package of cigarettes, some cigarette butts, and a small candle.  New Cingular called Luis Davila, a Coin Laundry employee who also managed and cleaned the strip mall premises, to testify that he sometimes cleaned trash off the roof, although his testimony on that point shed little light on the subject.  To further support its theory, New Cingular called expert witnesses who opined that the door to the cupola was open when the fire ignited, thus indicating that unknown persons had made unauthorized access into the cupola.

New Cingular argued that this evidence proves all its claims.  According to New Cingular, it proved that Magnolia Plaza breached its obligation to maintain the premises in "tentable" condition and to ensure New Cingular had the "sole, actual, quiet and peaceful use, enjoyment and possession of the Premises . . . " (Ex. 33), and further established that Magnolia Plaza failed to exercise ordinary care in securing the premises from outsiders, and that the fire resulted from these breaches and failures.

New Cingular's theory that an unauthorized person entered the cupola and somehow started the fire is unsupported by the evidence and amounts to little more than speculation and conjecture.  The Court notes the following:

(1) The credible evidence proves that the door to the cupola was closed and secured at the time the fire started.  LBFD Captain Wechsung credibly testified that he was with the initial group of firefighters at the scene of the fire, that he found the door (which he called a hatch) closed and secured, and that he used a pry bar to force it open.  That he made forcible entry is corroborated by the photograph at page 22 of the LBFD report, which shows the door, with warping along one edge consistent with having been pried off its hinges, lying on the roof to the left of the opening.  (Ex. 119 at 22.)  The contemporaneous report, dated November 26, 2006, contains further corroborating evidence by noting,

on its face under the heading "Actions Taken" a notation "52 - forcible entry," which is consistent with Capt. Wechsung's testimony. (Ex. 119.) The Court credits the testimony of Capt. Wechsung, backed up by contemporaneous evidence that the door was closed when he arrived at the scene, over the opinion of experts who, based on examination of photos showing some charring above the door on the outside of the cupola and a computerized model of the fire scene, concluded that the door was open when the firefighters arrived. The preponderance of the credible evidence indicates that the door to the cupola was closed when the fire started. A closed and secured door strongly rebuts New Cingular's contention that local gang members or transients were present in the cupola on the day of the fire.

(2) Davila, the Coin Laundry employee who also performs security services and controls access to the roof at Magnolia Plaza, testified to his control of the keys to the locked utility room door, to the procedures one must follow to obtain roof access, and to the fact that there have been no known incidents of unauthorized roof access over the years. The night before the fire, he was on duty at Magnolia Plaza and observed nothing unusual up to the time he left at approximately 8:00 a.m. the next morning. On his departure, he checked the utility room door to confirm that it was closed and locked. When he returned later that day after learning of the fire, he noticed that the door knob had been broken off the utility room door. He was advised that the LBFD had broken the knob to gain entry into the electrical utility room. Defense witness Frank Gimbel, who arrived the following day, noticed the broken door knob but was not in a position to say who or how it had been broken. The LBFD report suggests that the Fire Department forcibly opened the utility room door, as it notes that personnel "attempted to gain access to the roof by forcing three interior doors." (Ex. 33 at 6.) Although the report refers to "interior doors" and the utility room door is on the exterior of the building, the report indicates that

the firefighters were searching the premises to locate its roof access.  That they found it in the utility room is further substantiated by New Cingular's expert, Dan Bonelli, who noticed pry marks around the edge of the door that were similar to marks made by a tool (halligan bar) used by firefighters.  Although he opined that the firefighters would not have attempted to pry the door open because of a seam cover, he acknowledged the presence of the mark.  In light of this evidence, together with all of the other information available to the Court, the Court finds that firefighters (not some unknown, unseen, and never identified intruders) broke open the utility room door.

(3) The photographic evidence, the testimony of Capt. Willis, and the testimony of Frank Gimbel all indicate that there was no evidence on the roof to indicate that any unauthorized persons had been present and/or residing on the roof. Consistent with the testimony of Capt. Willis, the photographs show a very clean roof free of debris, graffiti, and any damage to roof-mounted electrical equipment.  This evidence corroborates Davila's testimony that he had never seen unauthorized people on the roof and further rebuts any contention that the rooftop of Magnolia Plaza was some sort of gang hang-out or refuge for the local homeless.

(4) In an attempt to persuade the Court that unauthorized persons had been in the cupola, New Cingular presented the testimony of John Awerkamp, who claimed to have seen a package of cigarettes, cigarette butts, and a candle inside the cupola during his examination the day after the fire.  The Court finds this testimony incredible.  First, the numerous photographs of the scene, including those taken by Awerkamp, depict no such items.  Second, the notion that any such items could have survived the fire defies reality.  Capt. Willis testified that the fire, which ignited and fully consumed portions of the wooden floor of the cupola, reached temperatures in excess of 1,000 degrees Fahrenheit.  One cannot imagine how a paper cigarette package, cigarette butts, or a wax candle

1   could have survived such a blaze.  Indeed, even defense witness Gimbel

2   ridiculed the idea that any such evidence could have withstood the fire when

3   asked whether there was any evidence that anyone had been living in the

4   cupola.  In short, New Cingular's evidence that this fire was started by gang

5   members or homeless transients falls far short of the mark.

6   Because the evidence does not support New Cingular's theory as to the source

7   and origin of the fire, and has plainly failed to establish to the satisfaction of the Court

8   that it is more probable than not that unauthorized persons started the fire, New

9   Cingular has not met its burden of proving that it is entitled to recovery under either

10   contract theory or its basic negligence claim.

11   New Cingular likewise cannot prevail on its negligence claim under a theory of

12   res ipsa loquitur.  To establish negligence based on res ipsa loquitur, New Cingular

13   must prove (1) that the fire is a kind of event "which ordinarily does not occur in the

14   absence of someone's negligence," (2) that the fire was "caused by an agency or

15   instrumentality within the exclusive control" of Magnolia Plaza, and (3) that the fire

16   was not "due to any voluntary action or contribution on the part of" New Cingular.

17   Howe, 117 Cal. Rptr. 3d at 130 (quoting Ybarra, 154 P.2d 687).  New Cingular cannot

18   establish the second element, that the fire was "caused by an agency or instrumentality

19   within the exclusive control" of Magnolia Plaza.  The undisputed evidence is that the

20   fire started inside the cupola, which, as New Cingular's leased premises, was under

21   New Cingular's control.  The lease plainly gives control of this area to New Cingular,

22   and as noted by Magnolia Plaza, the lease authorized New Cingular to build a fence

23   around the cupola if it wanted to do so.  New Cingular's effort to establish its

24   negligence claim on the basis of res ipsa loquitur therefore fails.

25   **B. MAGNOLIA PLAZA'S CLAIM**

26   The Court likewise concludes that Magnolia Plaza has not met its burden.  To

27   succeed on its contractual indemnity claim, Magnolia Plaza must prove that the fire

28   arose "directly" from New Cingular's use of the communication facility or from some

breach of the lease.  In its effort to prove this claim, Magnolia Plaza presented the testimony of Dr. Bell, an expert in microwave electronics, that the cellular communications equipment—the tower-mounted amplifiers (TMAs) in particular—could not be eliminated as the source of the fire.  But that is a far cry from proving that they in fact caused the fire.  Even though the TMAs might under some extraordinary set of circumstances undergo a dramatic failure that could cause a fire in a wooden structure, Dr. Bell acknowledged that such an event would be rare.  Dr. Bell admitted that he has no information regarding any such failure in a cell tower operated by a cellular telephone provider, and further admitted that he has no opinion as to the actual source and origin of the fire at the center of the present controversy.  Moreover, every other witness with some knowledge of the operation of cellular communications equipment testified that they have never seen or heard of a fire caused by cellular communications equipment.

Here, there is no evidence—direct or circumstantial—that any of the TMAs suffered any failure or that they caused the fire.  To the contrary, the evidence indicates that they continued to operate until sometime *after* the cupola started burning.  LBFD received the fire alarm at 11:39 a.m., and the cellular communications equipment did not send a signal that it had ceased functioning until shortly before 12:04 p.m.  To be sure, because of discrepancies in some of the times recorded by the alarm system, there is some cause to believe that the time the equipment sent its alarm signal does not perfectly reflect when the TMAs actually stopped functioning.  Nonetheless, the fact that the equipment did not signal its failure until 12:04 provides at least some evidence that the TMAs were still working at the time the fire started, which necessarily occurred sometime before the 11:39 a.m. alarm was received by the LBFD.  Further, the photos taken of the cupola and the equipment inside after the fire reveal no signs that the TMAs melted or exploded in the manner described by Dr. Bell in the event of a catastrophic failure of the internal electronic components.  Such an event would have been necessary if the internal malfunction were to somehow ignite the wooden floor in

the area of the fire's origin. Finally, the Court notes that, even if the TMAs had failed, the area where the fire commenced burning was some distance from the location where any hot debris might have dropped down from the TMA.  Accordingly, the Court finds that there is insufficient evidence to support any claim based on the failure of the TMAs or any other communications equipment housed in the cupola.

The Court further notes that, although it states its claim as one for contractual indemnity, Magnolia Plaza essentially seeks to prove its claim under a res ipsa loquitur theory.  Magnolia Plaza contends that because the fire started inside the cupola, and because the cupola was in New Cingular's control, New Cingular's use of the cupola must have—in some way—caused the fire.  This argument does not meet Magnolia Plaza's burden to show that the fire more likely than not arose from New Cingular's use of the communications facility.  First, by its own terms, the doctrine of res ipsa loquitur applies only to claims for negligence.  Magnolia Plaza has cited no authority applying a res ipsa analysis outside of the negligence or tort context.  Second, given the extremely low probability that any of the equipment inside the cupola caused the fire, the Court will not infer that the equipment started the fire from the mere fact that the fire started inside the cupola.  Contrary to Magnolia Plaza's suggestion, the fact that the cupola was "in use" at the time the fire started does not prove that the fire arose from that use.  The Court finds no evidence that the fire was caused by the communications equipment, and counsel has presented the Court with no other theories for how the fire might have started.  The Court therefore concludes that Magnolia Plaza has not met its burden to prove that the fire arose from New Cingular's use of the cupola.  Magnolia Plaza accordingly cannot recover on its claim for contractual indemnification.

## IV.

## CONCLUSION

The cause of the fire in the New Cingular cell site remains a mystery.  Each side offered evidence regarding its theory of how the fire started and argued why, on that basis, their adversary was responsible for the resulting damage.  Although there are

many possibilities regarding how the fire started, neither party has proven its theory by a preponderance of the evidence.  Because neither party has proven its affirmative case, neither party is entitled to any recovery in this case.

**IT IS SO ORDERED.**

DATED: January 10, 2011

_____
Judge Gary Allen Feess
United States District Court